NO. 10-20305

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

RALPH KLIER,
APPELLANT

V.

ELF ATOCHEM NORTH AMERICA, INCORPORATED,
now known as ARKEMA, INC.
DEFENDANT – APPELLEE

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION
_____

BRIEF OF APPELLEE
_____

Lewis C. Sutherland
VINSON & ELKINS L.L.P.
1001 Fannin Street, Suite 2500
Houston, Texas  77002-6760
(713) 758-2367 Telephone
(713) 615-5322 Facsimile

Counsel for Appellee
Arkema Inc. f/k/a Elf Atochem North America, Incorporated

November 29, 2010

## NO. 10-20305

## RALPH KLIER, APPELLANT

## V.

## ELF-ATOCHEM NORTH AMERICA, INCORPORATED, DEFENDANT-APPELLEE

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed individuals and entities as described in the fourth sentence of 5th Cir. R. 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

**APPELLANT**
Ralph Klier

**COUNSEL FOR APPELLANT**
Brian Wolfman
Georgetown University Law Center
Institute for Public Representation
Room 312
600 New Jersey Avenue, N.W.
Washington, DC  20001

Steve Baughman Jensen
Allen Stewart P.C.
Suite 2750
325 N. St. Paul Street
Dallas, Texas  75201

**PLAINTIFFS' CLASS REPRESENTATIVES**
Lillian Hayden
Thomas Hayden
Ann Kay
James Killough
Charles Roessner
Judith Roessner
Absent Class Members of the plaintiff class

**PLAINTIFFS' CLASS COUNSEL**
Dennis Craig Reich
Reich & Binstock
Suite 1000
4265 San Felipe
Houston, Texas  77027

Stephanie Esther Shapiro
Attorney at Law
3303 Main Street, Suite 305
Houston, Texas  77003

**DEFENDANT-APPELLEE**
Arkema Inc. (formerly Elf Atochem North America, Inc.)
Arkema Inc. is a corporation incorporated in the Commonwealth of Pennsylvania and is not publicly traded. Arkema Inc.'s ultimate parent corporation is Arkema S.A., which is a publicly traded corporation in France.

**COUNSEL FOR APPELLEE**
Lewis C. Sutherland
VINSON & ELKINS L.L.P.
1001 Fannin Street, Suite 2500
Houston, Texas  77002-6760
(713) 758-2367 Telephone
(713) 615-5322 Facsimile

**POTENTIAL CY PRES RECIPIENTS (non-Parties)**
New Horizon Scholarship Program
Brazos Valley Museum of Natural History
Children's Museum of the Brazos Valley
Carnegie Center of Brazos Valley History
Texas A&M School of Rural Public Health


s/ Lewis C. Sutherland
Counsel for Appellee

## STATEMENT REGARDING ORAL ARGUMENT

The Defendant-Appellee, Arkema Inc. f/k/a Elf Atochem North America, Inc. ("Arkema"), does not believe that oral argument is necessary in this case, but if the Court grants oral argument, Arkema respectfully requests the opportunity to participate.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................i

STATEMENT REGARDING ORAL ARGUMENT ............................................iv

TABLE OF AUTHORITIES ............................................................... vii

JURISDICTIONAL STATEMENT ......................................................1

STATEMENT OF THE ISSUES ........................................................1

STATEMENT OF THE CASE ..........................................................2

STATEMENT OF THE FACTS .........................................................2

    A.    The Case and Class Settlement ............................................3

    B.    Each Subclass Had an Independent Settlement Fund. ........................6

    C.    The Last-Minute Addition of a Medical Monitoring Program.............7

    D.    The Dispute Concerning the Leftover Settlement Funds and the Decision Below................................................................10

SUMMARY OF THE ARGUMENT ...................................................14

ARGUMENT.........................................................................15

    A.    Standard of Review........................................................15

    B.    The Settlement Agreement Does Not Permit Appellant's Requested Diversion of Subclass B Funds to Subclass A.................17

        1.    The Court Must Enforce the Explicit Terms of the Class Settlement Agreement..........................................17

        2.    The Class Agreement Explicitly Directs That the Remaining Settlement Funds be Used for the Benefit of Subclass B..........................................................19

3.    Subclass A Members Have Been Fully Compensated and Have No Legal Right to an Additional Pro Rata Distribution ............................................................................20

4.    Equity Does Not Support Reformation of the Class Settlement Agreement in Favor of Subclass A at the Expense of Subclass B ............................................................22

C.    The Court Properly Invoked the Cy Pres Doctrine and Acted within its Discretion in Choosing the Bryan Charities......................23

1.    Pro Rata Distribution to Subclass B is Not Reasonably Feasible.................................................................................23

2.    The Four Bryan Charities Chosen by the Court Have the Best Potential to Address the "Interests" and Provide "Personal Benefits" to the Subclass B members....................25

CONCLUSION ......................................................................................29

CERTIFICATE OF SERVICE.............................................................30

CERTIFICATE OF COMPLIANCE....................................................31

# TABLE OF AUTHORITIES

**PAGE**

**Cases**

*Baker Hughes Oilfield Operations, Inc. v. Cage (In re Ramba),*
  416 F.3d 394, 402 (5th Cir.2005) ........................................................16

*Brooks v. Georgia State Board of Elections*,
  59 F.3d 1114, 1120 (11th Cir. 1995) .................................................18

*Dahingo v. Royal Caribbean Cruises,*
  312 F.Supp.2d 440, 445-7 (S.D.N.Y. 2004) ...................................17, 18

*Diamond Chemical Co. v. Akzo Nobel Chemicals,*
  517 F.Supp.2d 212, 220 (D.D.C. 2007).........................................25, 28

*Elementis Chromium L.P. v. Coastal States Petroleum Co.,*
  450 F.3d 607, 613 (5th Cir. 2006) .....................................................16

*Evans v. Jeff D.*,
  475 U.S. 717, 726-7, 106 S.Ct. 1531, 1537, 89 L.Ed.2d 747 (1986).................17

*In re Airline Ticket Commission Antitrust Litig.,*
  307 F.3d 679, 682 (8th Cir. 2002) ...............................................16, 25

*In re Cendant Corp. Prides Litig.,*
  233 F.3d 188, 193 (3d Cir. 2000) .................................................15, 18

*In re Folding Carton Antitrust Litig.,*
  744 F.2d 1252, 1255 (7th Cir.1984) ....................................................16

*In re Holocaust Victim Assets Litig.,*
  424 F.3d 158, 161 n.3 (2d Cir. 2005) ..................................................26

*In re Pharmaceutical Industry Average Wholesale Price Litig.,*
  588 F.3d 24, 33 (1st Cir. 2009) ........................................................16

*Nelson v. Greater Gadsden Housing Authority,*
  802 F.2d 405, 409 (11th Cir. 1986) ...................................................28

*Powell v. Georgia-Pacific Corp.,*
  119 F.3d 703, 706 (8th Cir. 1997) ................................. 16, 21, 23, 24, 27

*Stinnett v. Colorado Interstate Gas Co.*,
    227 F.3d 247, 254 (5th Cir. 2000) ...................................................15

*Thompson v. Edward D. Jones & Co.*,
    992 F.2d 187, 191 n. 5 (8th Cir. 1993) .............................................18

*Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*,
    262 F.App'x. 215, 217-8, 2008 WL 114839 at *3 (11th Cir. 2008)...................19

*Wilson v. Southwest Airlines, Inc.*,
    880 F.2d 807, 812-3 (5th Cir. 1989) .................................................22

**Other Authorities**

Federal Judicial Center's MANAGING CLASS ACTION LITIGATION: A POCKET GUIDE
    FOR JUDGES (2005) ............................................................26

MANUAL FOR COMPLEX LITIGATION,
    FOURTH (Federal Judicial Center 2004)..........................................17

**Statues and Rules**

28 U.S.C. § 1291...................................................................... 1

40 CFR § 141.23......................................................................28

Federal Rule of Civil Procedure 23(e)....................................2, 3, 17, 21

## JURISDICTIONAL STATEMENT

Arkema agrees that this Court has jurisdiction over this appeal under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

The class settlement at issue included three subclasses, each of which was represented by separate counsel and class representatives during the settlement negotiation and approval process. This appeal addresses the trial court's order distributing monies left in the settlement fund for one of those subclasses (Subclass B) to four Bryan-area charities more than seven years after completion of the monetary claims administration. The membership of Subclass B roughly corresponds to persons who lived and worked within the geographic boundaries of Bryan, Texas. The specific issues include:

1. **Adherence to the Class Settlement Agreement**. Did the trial court properly adhere to the class settlement agreement in denying Appellant's request to transfer remaining funds attributable to Subclass B to personal injury claimants within Subclass A?

2. **Distribution of Funds under the Cy Pres Doctrine**. Where it is not reasonably feasible to make a second distribution of funds to absent subclass members, is it within the trial court's discretion to distribute monies remaining in the Subclass B settlement fund via the cy pres doctrine?

3.    **Choice of Cy Pres Recipients**.   Did the trial court act within its discretion in choosing four Bryan community charities as cy pres beneficiaries?

## STATEMENT OF THE CASE

This is a toxic tort case that was settled via a class action settlement approved under Federal Rule of Civil Procedure 23(e).   The trial court's order approving the settlement as fair, adequate and reasonable was entered on October 31, 2000, and the trial court's final judgment was entered on December 4, 2000. R:17916, 17970.   The finality and res judicata effect of the Rule 23(e) order and final judgment are not at issue in this appeal.   Instead, the only questions in this appeal involve the fate of slightly more than $830,000 left over after the conclusion of the settlement administration of the Subclass B settlement fund.   The trial court invoked the cy pres doctrine and ordered that the funds be distributed equally to four Bryan-area charities that serve the community that corresponds to Subclass B.   R:19160 (RE:163).   Appellant contends that the trial court's order was improper.

## STATEMENT OF THE FACTS

The class settlement in this case has a contentious history.   While a complete history is not necessary at this juncture, several historical details are helpful in putting the current dispute into context.

2

## A.    The Case and Class Settlement

The plaintiffs' claims arose from alleged injuries to persons and property from exposure to air emissions of arsenic and other chemicals originating from an agricultural chemicals plant operated for many years in Bryan, Texas.  R:17180-182 (summary of plaintiffs' claims in Sixth Amended Complaint).  The plaintiff class was originally certified as a litigation class in January 1994.  R:6862 (approving the Magistrate's Report and Recommendation).  The parties executed the first class action settlement on April 5, 1995.  *See* R:8635.  A number of absent class members objected to that class settlement.  There were a series of disputes regarding whether the magistrate judge could properly exercise authority as an Article III judge over the objectors who intervened in the case, a recusal of the district court judge, and related appeals that occupied approximately three years. *See e.g.*, R:13469-13543.  The first class action settlement was eventually approved under Rule 23(e) by the trial court on December 31, 1998.  R:17100.

A number of different objector groups appealed the first class action settlement to this Court, and the dispute was referred to the Fifth Circuit Senior Appellate Conference Attorney (Joseph St. Amant) for settlement discussions.  *See* R:17781-17786 (affidavit of Brian Wolfman[1] describing settlement negotiations).

---

[1] Mr. Wolfman is counsel for Appellant, Mr. Klier, in this appeal.  At the time of the original appeal in 1998 to 2000, Mr. Wolfman was employed by Public Citizen Litigation

With the assistance of Mr. St. Amant, the original settling parties and the primary objecting parties reached a preliminary settlement in principle shortly before this Court heard oral argument on the appeal.  R:17782.  Most of the parties moved to dismiss their appeals.  R:17153-57.  This Court vacated the order approving the first class action settlement based on the remaining claim by the Davis Objectors represented by Public Citizen Litigation Group.  R:17160 (The Court explained "[w]e are unable to ascertain the district court's basis for certification of a plaintiff class").  The Court then remanded the case to the district court for further proceedings.  R:17160.

Upon remand, the parties notified the district court of the potential for an amended class action settlement.  The district court appointed subclass counsel in connection with negotiation of this amended class agreement in February 2000.  R:17151-2.  The revised class settlement agreement was submitted to the district court for preliminary approval in August 2000.  R:17200.  Class membership was based on residence, employment and/or property ownership in two geographic areas (the "5 nanogram" and "10 nanogram" areas) both of which encompassed most of the City of Bryan, Texas.  R:17284-5.  The three subclasses consisted of: (1) Subclass A for residents in the 5 nanogram area and workers in the 10 nanogram area with certain specifically identified types of birth defects, still births

Group, which represented two sets of objectors (the Davis objectors and the Beifuss/O'Connor objectors).

and any form of cancer;[2] (2) Subclass B for residents and workers from the same class areas without the birth defects, still births and cancers covered by Subclass A; and (3) Subclass C for real property owners from the 5 nanogram area. R:17221-2 (RE:177-78).

Appellant is not strictly correct that Subclass B was a "medical monitoring" class. Brief of Appellant:7-9. While medical monitoring was one element of this subclass, the scope of the release and basis for the cash payments to Subclass B class members included a broad array of damages, including inconvenience, mental anguish, minor personal injuries, economic losses, as well as medical monitoring. R:17220 (defining scope of "Settled Claims"). The original settlement benefit protocol negotiated as part of the class settlement agreement distributed the entire Subclass B settlement fund (less attorneys' fees and expenses) as cash payments to all eligible subclass members. R:17231. The distribution protocol was based upon a series of factors including length of time within the class, proximity to the industrial plant, and the age of the claimant at the time of alleged exposure to plant emissions. R:17231, 17259-61.

---

[2] Appellant is incorrect in asserting that Subclass A applied to "arsenic-related cancers." Brief of Appellant:7. The class definition applied to "any form of cancer." R:17221 (RE:177). There were payment distinctions for five types of cancer based on class counsel's belief that there was some scientific evidence linking an increased risk for these five cancers to exposure to arsenic. R:17221 (RE:177). Arkema disputes the existence of any general or specific causation linking any class member cancers to exposure to chemicals from the Bryan plant.

### B.     Each Subclass Had an Independent Settlement Fund.

The agreement explicitly set out separate settlement funds for each of the three subclasses: $24.34 million for Fund A, $6.46 million for Fund B, and $10.6 million for Fund C.  R:17229.  Each fund was to "be used to fund payments to the members of [the particular] Subclass who qualify for such payments."  R:17229 (Settlement Agreement at ¶ IV.1.a-c).  The three funds were kept distinct.  For example, the protocol stated that if payment obligations exceeded the available money in a particular subclass fund – all payments to that subclass were reduced pro rata keeping each fund administration isolated from one another.  R:17258 (pro rata reduction of Subclass A claims); R:17261 (normalization of Subclass B monetary awards from total funds available in Subclass B fund); R:17265 (pro rata reduction of property claims).   The protocol also provided that if there were surplus funds for a particular subclass, then that surplus should be distributed to the relevant subclass.  R:17254 (¶27).

Moreover, the Subclasses had separate membership and counsel.  R:17221-2 (class definitions) (RE:177-8); R:17149 (district court's order indicating need to appoint separate counsel for three subclasses); R:17151-2 (district court's February 22, 2000 order appointing subclass counsel); 17244-5 (agreement executed on August 15, 2000 by counsel for three subclasses).  Indeed, membership in Subclass B expressly precluded the claimant's membership in Subclass A -- because one

class included persons with the listed injuries and the other excluded persons with those same listed injuries.  R:17221-2 (RE:177-8).

Finally, the $830,000 left over in Settlement Fund B at issue in this appeal would have been distributed to the Subclass B class members had the original plan been followed.  The class settlement agreement assigned $6.46 million to the members of Subclass B.  R:17229.  Under the original agreement, all of it (less attorneys' fees and expenses) would have been distributed to the Subclass B class members as cash payments in a single distribution, and we would not be here today discussing remainder funds or cy pres distributions.  R:17231 (describing cash distribution to Subclass B).

### C.     The Last-Minute Addition of a Medical Monitoring Program

After submission of the second class action settlement agreement to the district court for approval, one set of objectors remained, Mark Beifuss and Shanna O'Connor, represented by Public Citizen Litigation Group.  R:17745.  The primary complaints of the Beifuss/O'Connor objectors were that (1) the procedural restrictions placed on the back-end opt outs were too restrictive (an issue irrelevant to this appeal), and (2) the subclass members were "deprived of medical monitoring" in favor of cash payments.  R:17746.  Mr. Wolfman, current counsel for Appellant, provided an affidavit that was filed as an exhibit with the

Beifuss/O'Connor objections that raised these medical monitoring concerns. R:17781-6.

Ultimately, the Beifuss/O'Connor objectors and the other settling parties agreed to a last-minute revision to the settlement benefits provided to the Subclass B class members (the "Public Citizen amendment"). R:17911-2.[3] Two million dollars of the $6.46 million Subclass B fund were reallocated to a "medical monitoring fund." R17911-2 (RE:177-8). Subclass B class members were permitted to choose between a cash payment according to the provisions of the original settlement agreement or participation in a medical monitoring program. R:17911-2. The medical monitoring program would be set up under supervision of the district court and Settlement Administrator, and would provide diagnostic testing for various types of medical conditions. R:18301-339 (Settlement Administrator's Request for Judicial Approval of Medical Monitoring Program). Importantly, the Public Citizen amendment preserved the independence of the three subclass funds by restricting the allocation of any excess funds to only Subclass B class members:

> Conversely, if at any time the conclusion is reached that the amount set aside for medical examinations is not likely to be used in the future, either because of insufficient interest by or participation of, Subclass B members, or for any other reason, the Settlement Administrator, after conferring with Class Counsel and Public Citizen,

---

[3] The second page of this three-page agreement is missing from the record. The terms of this portion of the agreement are not critical to the issues in this appeal.

may present to the district court for approval a plan for ***distributing the projected surplus to members of Subclass B***.

R:17912 (emphasis added).

Of the 12,657 eligible claimants in Subclass B who filed claim forms, 339 (2.7%) elected to receive medical testing in lieu of a cash payment. R:18301. As a result, 12,318 Subclass B class members shared $4.46 million less applicable attorneys' fees and claims administration expenses ($362 per class member), and 339 shared potentially $2 million in medical monitoring less applicable attorneys' fees and claims administration expenses ($5,900 per class member). The Settlement Administrator made significant expenditures to develop a monitoring protocol for this tiny fraction of Subclass B. R:18304 (listing fees of $238,100 for the two doctors who developed the protocol). Participation rates dropped even further during the five year life of the medical monitoring program. R:19396.[4] More money was spent to draft a report at the close of the five year medical monitoring period. R:18875-99 (RE:181-2). The overall conclusion of the medical monitoring program was:

> The overall findings [of the medical monitoring study] should be viewed as reassuring to the Atochem settlement population that no significant health problems were uncovered over the course of the

---

[4] The Settlement Administrator explained to the trial court that "[t]wo things happened: One, not everyone who was eligible for medical monitoring and selected it participated at all. And then there was a fairly significant dropout rate where someone would go to the appointments for the first year and then choose not to go to appointments the follow-up year. That's where the savings is, all from doctor visits." R:19396 lines 10-16

program. Even though the possibility of some health issues that have long latency periods between exposure and disease, particularly cancer, may emerge as a future date, ***there is currently no suggestion that this appears to be a problem at the present time***.

R:18894 (RE:182) (emphasis added).[5] While the parties, Settlement Administrator, and the implementing medical services providers clearly had good intentions with respect to the medical monitoring program, in retrospect it had very low participation rates and very little utility to the Subclass B members.

### D. The Dispute Concerning the Leftover Settlement Funds and the Decision Below

The money left in the Subclass B settlement fund at issue in this appeal is money from the original $2 million allocated for medical monitoring that was not spent. R:19395-6. The medical monitoring program was designed to operate for five years and approximately $830,000 remained at the close of the program. R:18855-6 (Settlement Administrator's December 18, 2008 report describing operation of medical monitoring program); 19157 (Settlement Administrator's April 1, 2010 report indicating that $831,907.84 is available for cy pres distribution). The district court solicited proposals from all of the parties, including Appellants, regarding the proper disposition of the remaining settlement funds. R:18900. All of the parties, including Appellants, agreed that a second

---

[5] Appellant acknowledges that "because the Atochem plant was shut down in 1992, putting potential victims well into if not beyond any latency period, it is unlikely, though not impossible, that subclass B members will suffer injury." Brief of Appellant:28.

distribution to the broader class of more than 12,000 Subclass B class members was not reasonably feasible.    R:19389(Arkema), 19394(Klier), 19397(Klier), 19402(class counsel).[6]

More than seven years after the cash distributions to Subclass B,[7] well over half of the class members will likely have changed their physical address.[8]    Even within the claim administration window, changes in address and other circumstances caused the Settlement Administrator to lose track of one thousand or more claimants.  R:18263 (Settlement Administrator's December 4, 2001 report indicating that 3000 letters were returned as undeliverable and forwarding addresses were not available for 1000 of these).  Thousands of dollars were spent on tracking these class members.  R:18900 (Court order authorizing an additional $25,000 to hire a contractor to find missing claimants and payment of $150,000 to Settlement Administrator for related tasks).  Even with this expenditure, $130,000

---

[6] For example, counsel for Appellant explained: "The problem there is that once you go beyond this most severely injured group there really does become a practical problem that I think needs to be acknowledged, and is acknowledged, by everyone in the courtroom." R:19394.  Appellant's counsel also explained: "finding ourselves in the position that we do, *it is not, I believe, practically feasible* for that money to go to any other portion of the class, except for these 448 people [Subclass A class members]." R:19397 (emphasis added).

[7] See R:18288 (Settlement Administrator's May 15, 2002 Report indicating that claim qualification of Subclass B claims is complete).

[8] U.S. Census data indicates that 16 to 17 percent of Americans change their physical address each year.  *See* U.S. Census publication "Geographical Mobility."  Available at http://www.census.gov/prod/2001pubs/p20-538.pdf.  In the last seven years, a significant number of Subclass B members will have moved multiple times (making tracking more difficult) and well over half have likely moved at least once.

to $244,000 will escheat to the state of Texas because class members could not be found.  R:19416, 19157.

These problems will be even worse after a lapse of seven years and would result in expenditure of a large percentage of the remaining funds on administrative costs.  R:19402 (class counsel noting that the Settlement Administrator estimated that more than 50% of the fund would be consumed with administrative costs).  The Subclass B fund of $830,000 divided by the 12,657 Subclass B members equals approximately $65 per class member, but administrative costs for skip traces and other location tools will likely consume most of this amount.  For class members who cannot be re-found, their portion of that net amount would escheat to the State of Texas resulting in no benefit to the Subclass B members.  The district court acknowledged the economic wastefulness and impracticality of this course of action.  R:19394, lines 11-16.

On April 2, 2010, the district court held a hearing to consider the various proposals for the distribution of the remaining funds in Subclass B settlement fund.  R:19381-420 (RE:167-70).  The district court heard presentations from class counsel, defendant's counsel, and Appellant's counsel.  R:19381-420.  The district court also heard a presentation by two representatives from the Texas A&M School of Rural Public Health, Appellant's preferred cy pres beneficiary.

R:19403-11.  At the conclusion of the hearing, the district court concluded that the

remainder Subclass B funds should go to charities serving the Bryan community:

> I decide that the benefit to be conferred on Bryan, from what was a
> Bryan problem, perhaps to the friends and relatives of the claimants,
> perhaps to total strangers who happened to live there, is the best use. .
> . .
>
> I . . . believe it is important that the substitute trust, in effect, that's
> being furnished by reason of this settlement go to the locality in a
> more specific sense.  We have lots of projects at A&M which are of
> astounding use to everybody, but I think we need to do something for
> Bryan because that's where the harm was done.

R:19417-9.  The district court awarded the remainder Subclass B funds to four

Bryan charities.  R:19160 (RE:163).  All four of those charities directly serve the

Subclass B community.

- The New Horizon Scholarship Fund.  This fund is operated by the
  Community Foundation of the Brazos Valley and provides college
  scholarships to low-income students from the Bryan area.

- The Brazos Museum of Natural History.

- The Children's Museum of the Brazos Valley.

- Carnegie Center of Brazos Valley History.

R:19160 (RE:163).  None of these organizations have any relevant affiliation with

Arkema or the other parties.

Appellants filed a notice of appeal and have contended that the district

court's cy pres distribution was improper.  If this Court approves the district

court's cy pres order, that order should be the district court's final substantive order on this long and tortuous case that has already lasted for over 18 years.

## SUMMARY OF THE ARGUMENT

This appeal addresses the district court's order to distribute approximately $830,000 remaining in the Subclass B settlement fund to four Bryan-area charities under the cy pres doctrine.  Appellant requests that this Court rewrite the parties' class settlement agreement to shift funds designated for Subclass B to provide additional payments to members of Subclass A.  The Court does not have the authority to reach this result.  The Court must respect and enforce the bargained-for terms of the parties' settlement agreement, and the settlement agreement unambiguously provides that the remaining funds are allocated to Subclass B.  The Court lacks authority to change that allocation, and as a result, whatever use of the remaining funds is chosen, it must be for the benefit of Subclass B.

All of the participants in the April 2, 2010 hearing held by the district court to address the remaining Subclass B funds agreed that it was not reasonably feasible to distribute the remaining money to individual members of Subclass B. There are over 12,000 Subclass B members and it has been over seven years since the original distribution.  The administrative costs of updating address information and attempting to locate the Subclass B members would consume the lion's share

of any left over money. As a result, the district court properly invoked the cy pres doctrine.

The district court and the parties expended significant effort to identify proposed cy pres recipients with the potential to provide real personal benefits to the Subclass B members. The district court identified four worthwhile Bryan charities that serve the community encompassed by the Subclass B definition. As set out below, these charities meet the minimum requirements for the cy pres doctrine and the district court's order was not an abuse of its discretion.

## ARGUMENT

### A.    Standard of Review

A class settlement agreement is a contract, and construction of the agreement is subject to ordinary contract principles. *In re Cendant Corp. Prides Litig.*, 233 F.3d 188, 193 (3d Cir. 2000). This Court has articulated its standard of review for contract disputes as follows:

> Interpretation of ambiguous contracts implicates questions of fact, which we review for clear error; interpretation of unambiguous contracts presents questions of law, which we review de novo. Whether a contract is or is not ambiguous, however, is a question of law, which we review de novo.

*Stinnett v. Colorado Interstate Gas Co.*, 227 F.3d 247, 254 (5th Cir. 2000). Arkema contends that the class settlement agreement is unambiguous as it relates to the matters in dispute and is subject to de novo review.

A trial court's findings based on the weighing of facts and other evidence are reviewed only for clear error. *Elementis Chromium L.P. v. Coastal States Petroleum Co.*, 450 F.3d 607, 613 (5th Cir. 2006). The trial court's decisions regarding (i) whether a second distribution of settlement funds to absent class members is reasonably feasible, and (ii) whether the particular Bryan charities are appropriate cy pres beneficiaries are primarily factual determinations. A trial court's finding is not clearly erroneous "if it is plausible in the light of the record read as a whole." *Id.* (citing *Baker Hughes Oilfield Operations, Inc. v. Cage (In re Ramba)*, 416 F.3d 394, 402 (5th Cir.2005)). Other circuits have held that review of a trial court's decision to award a cy pres benefit from residual class settlement funds is subject to an abuse of discretion standard. *In re Airline Ticket Comm'n Antitrust Litig.*, 307 F.3d 679, 682 (8th Cir. 2002) *rehearing denied* (2002); *Powell v. Georgia-Pacific Corp.*, 119 F.3d 703, 706 (8th Cir. 1997); *In re Folding Carton Antitrust Litig.*, 744 F.2d 1252, 1255 (7th Cir.1984), *cert. dismissed*, 471 U.S. 1113, 1120, 106 S.Ct. 11, 86 L.Ed.2d 269 (1985); *see also In re Pharmaceutical Industry Average Wholesale Price Litig.*, 588 F.3d 24, 33 (1st Cir. 2009) (applying same standard where cy pres was agreed by settling parties and contested by objector).

### B. The Settlement Agreement Does Not Permit Appellant's Requested Diversion of Subclass B Funds to Subclass A

#### 1. The Court Must Enforce the Explicit Terms of the Class Settlement Agreement

The Court's first duty after approving the parties' class settlement agreement under Rule 23(e) is to enforce the parties' agreement. *See* MANUAL FOR COMPLEX LITIGATION, FOURTH (Federal Judicial Center 2004), at § 21.66 pp. 331-4 (describing the trial court's role in class settlement administration). As a general matter, the trial court only applies its equitable powers to resolve issues that are "not covered by the terms of the [class settlement] agreement." *Id.* at p. 334. Indeed, the United States Supreme Court has prohibited the trial court from remaking the terms of the class action agreement, at least as part of the Rule 23(e) settlement approval process. *Evans v. Jeff D.*, 475 U.S. 717, 726-7, 106 S.Ct. 1531, 1537, 89 L.Ed.2d 747 (1986).

Most of the case law that analyzes the trial court's authority to modify the class settlement agreement after approval under Rule 23(e) addresses proposed modifications of the claim submission deadlines. *See Dahingo v. Royal Caribbean Cruises*, 312 F. Supp. 2d 440, 445-7 (S.D.N.Y. 2004) (discussing cases). The general rule from this case law is the same as that articulated above – the trial court must enforce the expressly bargained-for terms of the class settlement agreement and has little to no discretion to modify those bargained-for terms. *Thompson v.*

17

*Edward D. Jones & Co.*, 992 F.2d 187, 191 n. 5 (8th Cir. 1993) ("To the extent that the preclusion of 'all claims of any nature whatsoever' is an integral part of the settlement bargain entered into for Jones and the class representatives, this Court cannot now modify the terms of that bargain"); *Dahingo*, 312 F. Supp. 2d at 445 ("[T]he court is not entitled to expand or contract the agreement of the parties . . . This principle is strictly followed in class actions where the relief requested would exceed that which the parties had bargained for . . ."); *see also, Brooks v. Georgia State Board of Elections*, 59 F.3d 1114, 1120 (11th Cir. 1995) (in the context of proposed revisions to a class settlement agreement to avoid a dismissal based on mootness, the Eleventh Circuit explained "[w]e are not free to delete, modify or substitute certain provisions of the settlement").

Greater latitude is provided to trial courts to adjust deadlines that were originally set by the trial court if equity supports a revision. *See, e.g., In re Cendant*, 233 F.3d at 191-2 (a claim deadline, which when submitted to the district court "simply contained a blank where the date should be inserted," was not "an integral part of the bargain" and could be modified based on equitable principles). The Eleventh Circuit has articulated the overall rule as follows: "[t]hus, the few courts to consider this issue have concluded that the court's authority to modify a term of the parties' settlement agreement hinges on whether the term was set by the court or bargained for by the parties." *Valley Drug Co. v. Geneva*

*Pharmaceuticals, Inc.*, 262 F.App'x. 215, 217-8, 2008 WL 114839 at *3 (11th Cir. 2008) (unpublished).

### 2.    The Class Agreement Explicitly Directs That the Remaining Settlement Funds be Used for the Benefit of Subclass B

Appellant's request that the trial court distribute the money in the Subclass B settlement fund to a limited number of Subclass A members is a request to reallocate funds from Subclass B to Subclass A.  *See* R:19400 (Appellant's counsel acknowledging that "Subclass A1 was not allocated this money under the settlement itself").  Both this Court and the trial court lack authority to modify the bargained-for terms of the class settlement agreement that would need to be changed to accomplish this result.  Section IV(A)(2)(b) of the class settlement agreement states that Subclass B should receive $6.46 million.  R:17229. Appellant's proposal would require the Court to reform this explicit contract language to reduce the original allocation to Subclass B.  Similarly, the Public Citizen amendment to the class settlement agreement requires that any "surplus" from the money allocated towards medical monitoring be distributed "to members of Subclass B."  R:17912.  Appellant's proposal would require the Court to reform this explicit language to direct the "surplus" to Subclass A.

These are material, bargained-for terms.  The subclasses were represented by separate counsel and class representatives.  R:17149-52 (district court orders identifying need for separate counsel for subclasses and appointment of same in

February 2000); R:17244-5 (execution of the settlement agreement by separate subclass counsel in August 2000).  The allocation of settlement funds among the subclasses – the area that Appellant's seek to change -- is the most important area of potential conflict.  The settlement agreement emphasized the separate nature of each fund.  R:177229 at ¶ IV.A.1.b. ("Fund B shall be used to fund payments to the members of Subclass B").  If there was a surplus in a particular fund, then the surplus was specifically directed to the particular subclass.   R:19254 (¶27).  Similarly, if the filed subclass claims exceeded the funds available for that particular subclass fund, then payments were reduced pro rata from within the specific subclass fund.  R:17258, 17261, 17265.  Money could not be reallocated from another subclass fund to make up the shortfall.

The allocation of the remaining funds to Subclass B was a "bargained-for" term of the class settlement agreement and the Public Citizen amendment.  This Court and the district court lack authority to make the fundamental change to the agreement requested by Appellant.

3.  **Subclass A Members Have Been Fully Compensated and Have No Legal Right to an Additional Pro Rata Distribution**

Appellants have failed to articulate any purpose of the settlement agreement that has gone unfulfilled that would be rectified by the proposed reallocation.  The Subclass A members were paid in full according to the terms of the agreement.

*See, e.g.*, R:18342-400 (Settlement Administrator's request for structured settlement payments to most seriously injured claimants of between $100,000 and $500,000). The trial court considered the terms of that agreement to be fair, adequate and reasonable. R:17970-74 (¶6). Appellant argues that Subclass A members have been undercompensated for their personal injuries. Brief of Appellant:13. Given the lack of scientific evidence in support of general or specific causation, that is highly unlikely. *See* R:17820-22 (plaintiff's lawyer explaining the impact of weaknesses in causation proof to the value of his client's claims).[9] More importantly, the Subclass A members have been fully compensated pursuant to an agreement that was adjudged to be fair, adequate and reasonable under Rule 23(e). Multiple appellate courts have held that under this circumstance the class members have no legal right to an additional pro rata distribution of any remainder funds. *Powell v. Georgia-Pacific Corp.*, 119 F.3d 703, 706 (8th Cir. 1997)("neither party has a legal right to the unclaimed funds"); *Wilson v.*

---

[9] The district court recognized that the class settlement is a compromise of these competing arguments and any gap between 100% of plaintiff's alleged damages and their ultimate recovery is not a basis to reform the class settlement agreement:

> MR. JENSEN:  . . . But none of those 448 people [in Subclass A] has received 100 percent of the damages that they claimed and would have sought at trial if this had gone ---
> THE COURT: They chose that as opposed to knowing what the trial outcome would have been.
> MR. JENSEN: There's nothing – we agree on that, Your Honor. Every settlement is a compromise. . . .

R:19393 line 23 to 19394 line 4.

*Southwest Airlines, Inc.*, 880 F.2d 807, 812-3 (5th Cir. 1989).  The law requires that this Court enforce the Parties' explicit agreement.

> 4.   **Equity Does Not Support Reformation of the Class Settlement Agreement in Favor of Subclass A at the Expense of Subclass B**

Even if equitable principles apply (which Arkema suggests they do not), equity does not favor the requested reallocation.  *See* R:19401 (district court noting that the "the equities are identical" between alleged potential under-compensation of Subclass B members and Subclass A members); R:19394 lines 3-11.  There is no support from class counsel, defendants, or the Settlement Administrator for the reallocation among the subclass funds sought by Appellants here.  R:19402 (class counsel stating "I don't think you can pick one part of the class and distribute money to and deny it to the others"), R:18857 (Settlement Administrator suggesting that the remaining funds be distributed to "charities based in and serving the Bryan/College Station area that was the subject of the underlying action"); R:19389 (similar comments by Arkema).

Moreover, Subclass B has already been short-changed by a severely underutilized and arguably unnecessary medical monitoring program that was created from $2 million of the Subclass's original cash benefits.  The empirical evidence for the medical monitoring program's lack of utility to the Subclass B members includes the high drop-out rate for even the tiny fraction (2.7%) of

subclass members who signed up.    R:19396 (Settlement Administrator commenting: "there was a fairly significant dropout rate where someone would go to the appointments for the first year and then choose not to go to appointments the follow-up year").   Appellant's proposal to reallocate Subclass B money to fully compensated Subclass A members would deprive Subclass B of its settlement benefits for a second time – adding insult to the original injury.

Arkema respectfully requests that the Court reject Appellant's request to reallocate the remainder funds from the Subclass B fund to the Subclass A fund.

### C.    The Court Properly Invoked the Cy Pres Doctrine and Acted within its Discretion in Choosing the Bryan Charities

#### 1.    Pro Rata Distribution to Subclass B is Not Reasonably Feasible

When confronted with unclaimed or unused class settlement funds, federal courts have generally considered four options: (1) pro rata distribution to the class members, (2) reversion to the defendant, (3) escheat to the government, and (4) cy pres distribution.  *Powell*, 119 F.3d at 706.  No party is advocating escheat to the government, and Arkema is not asserting a claim for reversion in this appeal. Thus, the available choices are (i) pro rata distribution to Subclass B members, or (ii) cy pres distribution.   The district court properly considered both of these alternatives and heard argument regarding them at the April 2, 2010 hearing.  Its

decision to provide funds to the four Bryan-area charities was not an abuse of discretion and should be affirmed by this Court.

The district court concluded that a second pro rata distribution to Subclass B was not reasonably feasible. More than seven years after the completion of cash distributions to Subclass B, a large percentage of the class members have moved. *See* Footnote 8 *supra*. The Settlement Administrator has already spent thousands of dollars tracking other missing class members under less challenging circumstances. R:18263, 18900. Approximately, $130,000 to $244,000 will already escheat to the state of Texas because class members could not be found. R:19416, 19157. These problems will be even worse after a lapse of seven years. The district court acknowledged the impracticality of this course of action. R:19394, lines 11-16. These circumstances are almost identical to the circumstances that the Eighth Circuit found sufficient to warrant a cy pres distribution in *Powell*:

> In this case, however, we agree with the district court that a cy pres distribution is potentially appropriate. The court found that it would be extremely difficult to distribute the funds pro rata, and we cannot say that this factual finding is clearly erroneous. Over a decade has elapsed since the initial distribution, and many class members have probably relocated. In fact, when the initial distribution occurred, over 125 checks were returned as undeliverable. A pro rata distribution would be further complicated by the fact that GP (the party entirely responsible for conducting the first distribution) is no longer responsible for locating class members and distributing the funds.

*Powell*, 119 F.3d at 706-7 (internal citations omitted).

In accord with the district court's ruling, all of the Parties acknowledged at the April 2, 2010 hearing that it would be exceedingly difficult to make a second distribution to Subclass B at this point.[10]   R:19389(Arkema), 19394(Appellant), 19397(Appellant), 19402(class counsel).   In any case, Appellants are not in a position to fault the district court's findings on this issue given their rejection of it as a "feasible" alternative at the hearing.   R;19397 (Appellant's Counsel: "finding ourselves in the position that we do, it is not, I believe, practically *feasible* for that money to go to any other portion of the class, except for these 448 people [Subclass A class members]") (emphasis added).   The district court here properly invoked the cy pres doctrine to distribute the remaining money in the Subclass B fund to charities that would benefit the Subclass B members.

2. **The Four Bryan Charities Chosen by the Court Have the Best Potential to Address the "Interests" and Provide "Personal Benefits" to the Subclass B members**

"In applying cy pres principles, it is appropriate for a court to consider (1) the objectives of the underlying statute(s), (2) the nature of the underlying suit, (3) the interests of the class members, and (4) the geographic scope of the case." *Diamond Chemical Co. v. Akzo Nobel Chemicals*, 517 F. Supp. 2d 212, 220 (D.D.C. 2007); *see also In re Airline Ticket Comm'n Antitrust Litig.*, 307 F.3d at 682-3 (identifying the following factors: (i) legitimate objectives underlying the

---

[10] The practical impediments to a Subclass B distribution are presumably why Appellants advocate an impermissible transfer of funds to Subclass A.

lawsuit; (ii) interests of the class members; and (iii) interests of those similarly situated); *In re Holocaust Victim Assets Litig.*, 424 F.3d 158, 161 n.3 (2d Cir. 2005) (same).

Appellant's objections to the district court's cy pres recipients address a single one of these factors -- the objective of the lawsuit. Appellants completely ignore the other factors – most particularly the interests of the class members. But, the Federal Judicial Center's MANAGING CLASS ACTION LITIGATION: A POCKET GUIDE FOR JUDGES (2005) suggests that the class members' interests are actually the most important factor. This resource written for federal district court judges suggests "whether the class members might feasibly obtain a *personal benefit* [from the cy pres beneficiary]" is of primary consideration. MANAGING CLASS ACTION LITIGATION: A POCKET GUIDE FOR JUDGES (Federal Judicial Center 2005), at 13 (emphasis added).[11] That is exactly the type of analysis that the trial court conducted here, concluding that "it is important that the substitute trust . . . that's being furnished by reason of this settlement go to the locality . . . we need to do something for Bryan because that's where the harm was done." R:19418-9.

As set out in the Statement of Facts, each of the four charities designated to receive funds under the district court's order directly serve the Subclass B area.

---

[11] The FJC pocket guide for federal judges also suggests a related consideration of "the proximity or distance between the cy pres recipient's interests or activities and the particular interests . . . of the class members." *Id.*

*See* R:19036-85 (describing cy pres applicants). They consist of two local museums, a local library, and a college scholarship fund for local low-income students. Each of these charities is an institution that has good potential to provide "personal benefits" to the Subclass B members. *Id.* Each is an established area charity that has existed in the community for a number of years. *Id.* None of them has any significant ties to any of the parties.[12]

Appellant suggests that the district court's focus on the community that overlaps the class membership was an inappropriate criteria for consideration of potential cy pres recipients. Brief of Appellant: 40-1 ("No case of which we are aware holds that because a locus of a case is a particular community it is appropriate to direct a cy pres award to any charity that serves that community"). Contrary to Appellant's suggestion, the Eighth Circuit has approved the use of cy pres relief to fund college scholarships within a specific geographic area impacted by that case. *Powell*, 119 F.3d at 707.[13] One of the approved cy pres recipients here is a similar local scholarship program. The Eleventh Circuit has also

---

[12] Appellant insinuates with absolutely no support from the record (or any other facts) that "a cy pres award to New Horizon would benefit the defendant." Brief of Appellant: 43-44. As is clearly set out in the record, Arkema has no relationship with the New Horizon Scholarship Fund other than the fact that it has previously donated money to the charity. R:19050-52(¶5). Arkema will have no obligations to New Horizon and receive no benefits from it regardless of whether this Court approves or disapproves the district court's order.

[13] Specifically, the Eighth Circuit explained: "because the scholarships will be made available only to black students in the vicinity of Crossett, Arkansas, the program will likely also promote the plaintiffs' desire to have the scholarships benefit the class members' younger relatives." *Id.*

approved a cy pres distribution based on the geographic scope of the class among other criteria. *Nelson v. Greater Gadsden Housing Authority*, 802 F.2d 405, 409 (11th Cir. 1986).[14]   For cases like this one, geographic limitations are a reasonably accurate and manageable mechanism to identify the relevant community of class members.  If the district court's objective is to give money to charities that provide "personal benefits" to the Subclass B members, it needs to give money to charities that serve the Bryan community – because that is where the class is concentrated.

Finally, Appellant's proposed cy pres recipients do not represent better alternatives than the four charities chosen by the district court.  One project would investigate arsenic concentrations in the wells of rural landowners.  R19405-6.  That project has no potential to benefit the class members because the entire Subclass B area is covered by the City of Bryan municipal water system which already tests its water for arsenic on a regular basis.  *See* 40 CFR § 141.23 (requiring monitoring of public water systems to demonstrate compliance with the arsenic maximum contaminant level).

The second proposal would use statewide data in Texas to compare the frequency of birth defects with the levels of arsenic and manganese in public water systems.  R:19408-410.  This proposed scientific study has no tangible utility to the

---

[14] Appellant also fails to explain why "geographic scope of the case" is a factor that is specifically identified by the Court in *Diamond Chemical* for consideration of cy pres recipients. *Diamond Chemical*, 517 F. Supp. 2d at 220.

class members and addresses communities far beyond the class area. Both projects proposed by Appellant are designed to develop scientific theories and knowledge with little tangible relevance to the class members, their local community, or even the issues in the litigation (which was an industrial air emissions case). *See* R:19399 (the district court commenting: "the arsenic well cleanup study -- . . . I just don't think it's directly related to the problem here").

The district court chose worthy charities that serve the Bryan area as cy pres recipients. These charities meet the minimum requirements of the cy pres doctrine and the Court's order was not an abuse of discretion.

## CONCLUSION

For the foregoing reasons, Arkema respectfully requests this Court to affirm the district court's cy pres order. Arkema also requests all such other relief to which it is entitled.

Respectfully submitted,

s/ Lewis C. Sutherland
Lewis C. Sutherland
VINSON & ELKINS L.L.P.
1001 Fannin Street, Suite 2500
Houston, Texas  77002-6760
(713) 758-2367 Telephone
(713) 615-5322 Facsimile

Attorney for Defendant-Appellee
Arkema Inc., f/k/a Elf Atochem North
America, Incorporated

November 29, 2010

## CERTIFICATE OF SERVICE

I certify that on November 29, 2010, the foregoing Appellee's Brief has

been served through this Court's electronic filing system, on counsel for the

Appellant:

Brian Wolfman
Georgetown University Law Center
Institute for Public Representation
Room 312
600 New Jersey Avenue, N.W.
Washington, DC  20001

Steve Baughman Jensen
Allen Stewart P.C.
Suite 2750
325 N. St. Paul Street
Dallas, Texas  75201

s/ Lewis C. Sutherland
**Attorney for Appellee Elf Atochem
North America, Incorporated**

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because it contains 6,984 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii) and the Rules of this Court.

2.      This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2003 in 14-point Time New Roman font (with footnotes in 13-point Times New Roman font).

3.      This brief complies with the requirements for redaction of private information; it is identical to the paper copy of the brief; and the electronic file containing it has been scanned for viruses with an updated version of a commercial virus scanning program and is free from viruses.


        s/ Lewis C. Sutherland
        Attorney for Appellee Elf Atochem
        North America, Incorporated

November 29, 2010

US 657090v.1